Good morning. Your Honor, this case involves a relatively small fishery that causes enormous harm to the marine environment, each year killing critically imperiled sea turtles and hundreds of albatrosses and other migratory birds. While the defendant agencies and intervener tout improvements in the fishery that have reduced the death toll from even higher levels in the past, those improvements would not have happened if concerned citizens had not taken their government to court to compel strict compliance with the environmental laws that govern the fishery. Today we are discussing three laws that impose mandatory duties on to ensure protection of our nation's environmental heritage. As in the past, citizens have had no choice but to take their government to court because the government has proven all too willing to bend the law to the demands of the fishery. Let's turn first to the Migratory Bird Treaty Act, which promotes the conservation of migratory birds by strictly prohibiting unauthorized harm to even a single bird. I have a question. I just want to clear up whether you, if you argue this or not, just to make sure exactly what you are arguing. Do you argue that the Fish and Wildlife Service is without authority under the MBTA to regulate incidental take because the MBTA does not prohibit incidental take? Do you make that argument in your briefs at all? Your Honor, just to clarify the question, our position is that the MBTA does regulate incidental take of migratory birds. Yes, I mean, I think your position from this point of litigation is that the permit is required, right? Absolutely, Your Honor. Okay. So our position is... Can I ask you, though? We have a recent decision that just came out to protect our communities versus jewel. And in that case, a panel of this court reaffirmed our previous holding. I think it was in Seattle Audubon, that the MBTA does not govern indirect bird killings. Right? I mean... Your Honor, I don't believe that's a... We don't share that characterization of the Protect Our Communities Foundation case. If you look at the case, it's... Well, let me preface that... Let's do it this way. Let's just assume that it does, and then you can answer, and then you can tell me why it doesn't. But it seems to me that it might indicate the decision in Protect Our Communities that the MBTA does not govern indirect bird killings. And if that is the case, just go with me for a little bit here. If that's the case, did the National Marine Fisheries need a permit in the first place? Okay. I'm going to preface the answer by saying, Your Honor, that in this case, the question is not presented to the court whether the National Marine Fisheries Service needed an MBTA permit. Rather, the question is whether, having applied for a permit and the Fish and Wildlife Service having granted it, whether the Fish and Wildlife Service had regulatory authority or had the authority under its own regulations to issue the Incel Take permit. But I understand the court's concern. Our reading of the Protect Our Communities Foundation case is that what the court was grappling with with respect to the Migratory Bird Treaty Act was whether an agency like the Bureau of Land Management, whose sole connection to the proposed wind project was to grant a lease, whether the exercise of that regulatory authority made the BLM liable under the MBTA for what then would be the incidental take of the wind farm. So throughout the case, there's incidental take. So let's just be clear. Incidental take is when, through another activity, you incidentally take a migratory bird as opposed to intentionally do it. Now, most of the Fish and Wildlife Service regulations deal with intentional take, whether it's depredation, whether it's research on the birds, whether it's banding. Those are all intentional take. So in the panel decision from last week, they don't question that the wind industry might need a permit for its incidental take and that the Migratory Bird Treaty Act covers incidental take. And in fact, they go on at great lengths about how the BLM obliged the applicant to the lease to ensure, as a condition of the lease, that it would get whatever permit coverage it needs. And even further, Your Honor, if you look at the treatment of the Navy situation that the District of Columbia dealt with in the Center for Biological Diversity versus PERI context. So this is on page 9 of the Court's opinion. When it's talking about – it's distinguishing from the BLM context, where the Department of Defense itself was trying to seek Migratory Bird Treaty Act coverage for its incidental take. Because again, in that case, the Navy was not intentionally taking birds. Rather, it was conducting military readiness activities that resulted in the incidental take of migratory birds. And there is no question, either in the PERI case or in this Court's treatment of that case, there, they say, agencies may be held liable for violations of the MBTA when they themselves engage in the taking of protected birds. So the Court recognized that the Navy was engaged in the taking of protected birds, even though it was incidental. And then the question in PERI was whether the Migratory Bird Treaty Act allowed the Fish and Wildlife Service to issue a permit for that take. And even though this case arose in the context of national security, arose in the context of military training, the Fish and Wildlife Service said unequivocally – and that's in the PERI 1, the first of the cases – that we can't issue – Can I take you back, though, to that protect our communities? Because the way I'm reading it is that the Court held that the MBTA does not contemplate attenuated secondary liability on agencies like NIMS that, quote, that act in a purely regulatory capacity and whose regulatory acts do not directly or approximately cause the take of migratory birds within the meaning. And so do you agree that this precedent does not control here because the direct incidental take of the birds by a fishery, not the federal agency, is at issue? Well, actually, in the Protect Our Communities Foundation case, the Court actually, I think, distinguished the scenario involving the National Marine Fisheries in this case from what was going on with BLM. So for BLM, BLM's sole involvement with the WIND Project was that it was granting a lease and that as a condition of the lease, it said get whatever permits you need. The Court specifically addresses this situation and says – this is on page 10 – NIMS could be said to function in a managerial capacity over the activities of the fishery. So it's not just acting in a regulatory capacity, but the National Marine Fisheries Service is acting in a managerial. And then it goes on to say, if so, then NIMS would occupy a more directly supervisory – supervisorial position over a regulated third party than that of a typical agency. And that's – that was absolutely correct. The National Marine Fisheries Service, its relationship to the fishery here is not as a – granting a lease. It's regulating every single aspect of how that fishery operates. Under the Magnuson-Stevens Act, these fisheries operate pursuant to fishery management plans. So as the name indicates, they manage the fishery. And NIMS promulgates the regulations, including the regulations set forth at 50 CFR 665.815, which are the regulations about what the fishery needs to do or doesn't need to do with respect to avoiding take of the findings suggested by the panel that NIMS is different. Its relationship to the fishery is such that it's managing it, and therefore we're not dealing with imposing vicarious liability on a regulatory agency like BLM. We're dealing with a manager who really decides, you know, calls the shots in terms of what the fishery can do. And not only the law suggests that, but the Fish and Wildlife Service found the same thing. I might interrupt, just to get back to where you started. Why don't you tell us what's going on with this permit, in your view? Yes, Your Honor. I don't want to, you've only got 10 minutes left, so I don't want to revert this on an issue which is interesting, but may not be central to this case. Okay. I just, just to finish the thought there, Your Honor, if you look at Supplemental Excerpt of Record 353, where the Fish and Wildlife Service says the individual longliners are quote, under the direct control of the permittee, and then both of the permits issued, the 2012 permit and the 2015 permit, make NIMS responsible for making sure the longliners do what they're Back to the question of, you know, so our basic theory of the case with respect to the MBTA is that the regulations that the Fish and Wildlife Service has for authorizing take of migratory birds does not authorize take for activities that are not related to migratory birds in the sense that they have as their focus, migratory birds. And it's not just our interpretation of the regulation, but it's Fish and Wildlife Service's interpretation of the regulation up to the moment that they issued this permit. We cited in our reply brief some regulations that the Fish and Wildlife Service promulgated in 2009 under the Bald and Golden Eagle Protection Act, which is an analogous statute. It actually overlaps because bald eagles are protected as migratory birds. At the time that the Fish and Wildlife Service promulgated these incidental take regulations for these eagles, industry, the power industry, expressed concern that, quote, utilities will still be liable under the Migratory Bird Treaty Act for incidental take of other birds since no permit is available for the incidental take under the MBTA. In the response to the comments, and this is at 74 Federal Register 46862, the Fish and Wildlife Service officially stated, quote, no permit is currently available to authorize incidental take under the MBTA. It couldn't be clearer than that. Fish and Wildlife said that liability concerns would be addressed via prosecutorial discretion, not permitting, because they understood their regulations, including the special purpose regulation, does not cover incidental take for activities that are not directed towards migratory birds, such as conservation activities. That's exactly what came up in the Navy context in Center for Biological Diversity versus PURI. Again, Fish and Wildlife Service repeatedly refused requests from the Navy to get an incidental take permit to allow military training activities to go forward. Now, if the compelling justification prong of the special purpose permit allows anything, one would think that it would allow that. But the service was quite clear that it was not allowed. And when the case eventually ended in injunction, Congress intervened and didn't say, Fish and Wildlife Service, hey, use your existing authority under 2127. They said, promulgate a new regulation, because we need a regulation that will allow for incidental take. Now, that's critical in this case, because when you have an agency changing a longstanding interpretation, the Supreme Court instructs in Smith, Klein, Beecham Corporation that its new interpretation is not entitled to be heightened deference under our V. Robbins. Instead, what this court is called upon to do is use the standard tools of interpretation to try and figure out what the regulation says. Tools like, is an interpretation rendering language surplus? Tools like, adjust them generous? Is there something in the regulation that tells us how we're supposed to interpret this term compelling justification? So the problem with Fish and Wildlife Service's interpretation, a newly minted interpretation, is that it would render superfluous all this language in the regulation that an activity needs to be related to migratory birds or a migratory bird-related activity. Because if the only nexus to a migratory bird that's required to fall under this provision is that you happen to be incidentally killing them while doing something else, well, that would cover everything. That would cover the entire universe, because you wouldn't need the MBTA permit if you weren't harming the birds. So this court and the Supreme Court have repeatedly said that courts must construe regulations to give effect to each provision. You also, as the Supreme Court did in Smith, Klein, need to apply adjust them generous. So when you've got a series of provisions and then a catch-all at the end, it's important to know what those provisions are saying. And in this case, all of the previous language, whether it has to do with a significant conservation benefit or important research or concern for individual birds, they all have to do with an activity directed towards migratory birds. And that's why, until this permit issued, it's notable that the Fish and Wildlife Service only issued two incidental elimination permits under the Special Purpose Permit Regulation in the nearly 40 years that this regulation's been on the books. Now, they're in the process of doing some other regulations, right? Yes. I know this case probably has gone on for a long time and will continue to go on, right? Has the parties mediated this at all? Not to my knowledge, Your Honor. And, you know, we participated in the commenting on the Fish and Wildlife Service report. And I think it's important for them to be mindful of the MBTA's conservation purposes and require the fishery to do everything that it reasonably can do to eliminate the take, or at least minimize the take. And the record is replete with comments of Fish and Wildlife Service employees participating in the process who wanted to insist that the fishery would implement additional measures that have been identified by the Fishery Service and others as being key to reducing migratory bird take. And that that's the only way to fulfill the conservation purpose of the statute. But the Fishery Service pushed back and said that they wouldn't consider any of those. And as a result, none of them were incorporated into the permit. But, you know, let's contrast here what the Fish and Wildlife Service did with the Eagle Protection Act, where when they, in a conscious way, decided to implement in-cell take regulations, they provided that they will only issue in-cell take for eagles if the applicant is not implicating the conservation of the species and is also avoiding all take that it can. And that's exactly what the Fish and Wildlife Service is now proposing with respect to in-cell take under the MBTA. And we would suggest that, you know, we don't know the outcome of that process, but if the Fish and Wildlife Service wants to, you know, eliminate the take, and then issue permits for in-cell take of migratory birds, it needs to promulgate a regulation that has some standards to do that and are consistent with the conservation purpose of the Migratory Bird Treaty Act. It can't try and use a special purpose permit that for 40 years has never served for this purpose and that the service has repeatedly gone on record as saying can't be applied to this purpose and try and use it here. It violates every standard of statutory and regulatory interpretation. And most importantly, you know, under just basic notions of administrative law, if you don't know why they determined that this fishery operation was a compelling justification, whereas Navy readiness – military readiness training was not, what we have is a – you know, an interpretation of the regulation that would allow the agency to do whatever it wants whenever it wants. And that's exactly what it expressly states. Isn't it implicit in the – I think the government concedes that they could have done a better job of explaining compelling justification. But don't we sort of have in the materials that if – that the fishery is economically important, has little impact on the birds, and I think the agency explains probably has a net benefit on endangered turtle species by offsetting fishing by foreign vessels that do not employ the measures to mitigate harm to wildlife? Well, the – you know, obviously the government in the absence of any statement in the record as to why there's a compelling justification and what constitutes a compelling justification, they try to cobble something together. Now, the environmental assessment's very clear that the Fish and Wildlife Service did not agree that allowing this fishery to operate would result in any fewer migratory bird takes. They do analyze an alternative, alternative one, that would result in less fishing, and they say, well, then there'd be less takes. Well, but if you shut this fishery down, does it mean that no one's going to fish there? It doesn't mean that, does it? What it means is that there's not going to be an illegally issued permit under regulations that don't apply to it. But aren't they sort of saying there that shutting this one down, then it allows international people to fish there who don't – aren't controlled by anything? The record with respect to migratory birds is quite clear that the Fish and Wildlife Service made no findings that allowing this fishery to operate in any way benefits migratory birds. In fact, they expressly say in the environmental assessment, this fishery does not confer a benefit on migratory birds. It kills them. So, you know, in Smith-Klein-Beacham, the Supreme Court expressed great concern at page 2168 against deferring to an agency's interpretation of its own ambiguous regulations. It raises the risk that agencies will promulgate vague and open-ended regulations they can later interpret as they see fit, thereby frustrating the notice of predictability purposes of rulemaking. That's precisely what's going on here, Your Honor. You know, not only conservationists should be concerned about this, but industry. How would one – how would industry know what they need to do to satisfy the so-called compelling justification if Navy training doesn't satisfy, but somehow a small fishery that has insignificant environmental effects per the Fish and Wildlife Service's environmental assessment, if somehow that satisfies it? Can I ask a question about the sea turtles? It seems like the National Marine Fisheries Biop contains a pretty thorough discussion of the direct and indirect effects on the sea turtles. And as you know, our deference to the agencies is probably, you know, at its highest when the scientific studies are concerned. And so I'm trying to figure out, you know, what error that you would highlight, you know, I guess, that you think is the most omitted in concluding that the fisheries operations would not jeopardize the sea turtles, because it seems like you may be asking us to substitute our interpretation of the science for the agencies, which we're not supposed to do. Absolutely not, Your Honor. I see my time has expired, and that's a – Go ahead and answer the question. Thank you. Okay. That question will require a little amplification. So because we understand the deferential standard under which the court evaluates the biological opinion, we do not question the agency's choice of models. They had an expert that prepared models. One was called climate-based, but to be clear, did not incorporate climate change. It just incorporated some periodic changes in the ocean currents, and one that was called classic. They chose to use the climate-based model. We do not question that. However, even though there is – there's deference, as the National Wildlife Federation versus NIMS case, as in Wild Fish Conservancy versus Salazar, this court needs to make sure that the agency properly explained how it got from point A to point B. So very briefly, with respect to loggerheads, the problem is that they applied a climate-based model that said that turtles – loggerheads were declining precipitously. They chose, not Wade, a quasi-extinction threshold as the measure of when one should be concerned about jeopardy. Now, they'll come back and say, well, that's not true extinction. Well, we didn't choose it. You know, when you choose a scientific method, you need to explain consistent with your scientific method. All of the runs to the loggerhead goes below quasi-extinction. Then they deepen the jeopardy, which National Wildlife Federation versus NIMS says you cannot do, by, as they modeled it, as their expert modeled it, a 4 to 11 percent decrease in the population. So they were – they're bad off under the status quo. They're worse off with this fishery. They try and save that by reference to this spillover effect. If we don't fish, someone else will fish, and therefore, it's better to let them kill a few turtles than someone else kill a lot of turtles. The problem with that is you can only take into account those types of indirect effects when they're reasonably certain to occur. And while – and it's plain as day in the biological opinion that both with respect to loggerheads and leatherbacks, they say we cannot quantify with precision the number of adult female mortalities. All of their If you can't quantify the female mortalities, then you can't take into account spillover effect, which is why they try and hedge their bets and say, with or without it, there's still no jeopardy. With respect to leatherbacks, the problem there is this action is open-ended. It goes on forever. I was most concerned about the loggerheads. Okay. And just – their own experts said, use the climate base for the first 25 years, then use the classic – and if you have available information like that, you can't ignore it. That fails to give the benefit of the doubt to the species. Thank you. Thank you, counsel. Good morning. May it please the Court. Brian Tufts in the Department of Justice representing the Federal Defendant's Appellees. I intend to speak for 15 minutes and reserve five for intervenors' counsel. I'd like to start with the Protect Our Communities Foundation case. A couple things I agree with, with what my friend said. First of all, the issue of whether a permit is required for the Secretary of Commerce in managing the fishery is not directly at issue in this case. It's a logically antecedent question. It's a what question? I mean, it logically precedes the question of their permit challenge, so sometimes courts reach out to resolve those questions. The court doesn't need to do that on the merits here. We do think that decision does relate to the question of relief if this court were to agree with my friend on the merits of the MBTA or NEPA claims. And we think it shows that if even the most relief that a court could order on the MBTA claim, for instance, would be vacatur of the permit, that's not any longer effective relief to redress their Article III injuries. And so that does bear upon the justiciability of their claims. Well, let me ask you about Protect Our Communities, and I asked a similar question of your opposing counsel, but I just, reading the Protect Our Communities, it seemed pretty clear. They the Fish and Wildlife Service basically, at least from my interpretation, is the lack of authority under the statute to issue an incidental take permit. I mean, based on their language, they say the agencies themselves are not subject to the prohibitions of the MBTA when acting in the regulatory capacities, thus are generally not required to seek a So I'm just trying to figure out if the Fish and Wildlife Service can't regulate incidental take under the MBTA, don't we have to conclude that the Fish and Wildlife Service lacked authority under the statute to issue the incidental take permit to the NMFS? I don't believe so, and I would look at it a little bit differently. The statute is very broad. The Fish and Wildlife Service can issue regulations so long as it determines the regulations allow take that's compatible with the conventions, the treaties. That's pretty broad. So there's been no challenge to the regulations here, it's just a challenge to the application of the regulations to the fishery. That said, the way we view the limitation that you just articulated, federal agencies do not have to apply for permits when they are permitting third-party activities that incidentally take birds. It's not that the federal government doesn't believe that incidental take isn't encompassed by the prohibition in the Migratory Bird Treaty Act. It certainly is, and we prosecute criminally the incidental take of migratory birds by private third parties. It's just that when a federal agency regulates that activity, it's even further removed in the chain of causation, and so principles of proximate cause would limit the federal agency's liability and would not require it to seek a permit here. We think that's what the PROTECT case stands for, and so I'll just touch on this briefly. I do think it bears upon whether the relief that they could obtain would be effective because, after all, if the permit is vacated, the Secretary of Commerce could choose just to continue to operate the fishery in the absence of a permit, choose to withdraw its permit application altogether, and there wouldn't be any ability of a court, after the PROTECT case makes clear, to issue an injunction against the National Marine Fisheries Service for managing the fishery in the absence of a permit. So you're saying if we found fault in the permit, it shouldn't be remanded to the district court? I think that's right. I think it could be vacated, but there's no obligation for the Fish and Wildlife Service to complete an action on remand, so long as you make clear that the permit is not required for the fishery. Right. I mean, I think both parties are taking the position in this litigation that the agency has the authority to issue the permit, and if there's some challenge to that later, that's a different case. Right. I think that may be true. I mean, we think that it bears upon justiciability, but I've said that, so I'll move on and talk about the merits of the permit challenge. The focus of my presentation was on the MBTA claim seems to have been the words related to birds, and when Fish and Wildlife Service grants these special purpose permits, it does so very infrequently, that's true, but it has not established any sort of set standards other than what's in the regulation on when it's going to grant them. It has simply made decisions on a case-by-case basis. So why are we supposed to give a deference then? So the deference that's owed, it comes into play in two respects. One is that the standard of the arbitrary and capricious standard in the APA requires only substantial, at most, substantial evidence supporting the Fish and Wildlife Service's determinations. That means only enough evidence for a reasonable fact finder to conclude that there was a compelling purpose. So that's a fairly high hurdle for plaintiffs to overcome. There's also deference to the interpretation of the regulation under Seminole Rock and those related cases, and we do believe that the Fish and Wildlife Service's interpretation as articulated in this record is an interpretation of its regulation for this case that warrants that type of deference, but granted, there's nothing broader that I can point to. So what's the regulating that's going on now that isn't bearing on this case? But aren't they realizing now that they need to do some regulating here because it's not that clear? So more and more, as wind energy projects become very common now and there are congressional mandates to promote wind energy on the public lands and so forth, this migratory bird issue has come to the forefront. And the Fish and Wildlife Service is in the process of proposing a series of approaches to incidental take. It hasn't finalized any approach. It could involve a broader program of permitting incidental take. It could involve guidance for industries that they follow, or it could involve both individual permits and general permits. But if the Fish and Wildlife Service had authority under section 2127 to issue an incidental take permit, why did it believe it was necessary to create a new regulation? This is a pretty limited regulation. I mean, special purpose is supposed to mean... Well, special purpose is supposed to be pretty limited. And this argument here, interesting argument being presented, whether you went beyond that narrow purpose. And I'm just having a hard time with the... And I know you say that they had authority to issue the permit, but I don't know. It seems like under the Protect Our Communities in Seattle Audubon, it says they didn't need a permit. And so I'm just trying to figure out how do you enforce or grant a permit when it really wasn't necessary in the first place? And then Fish and Wildlife Service say, no, since fisheries have come to us, we're going to issue a permit, and we're going to do it under this very narrow exception that's normally used for, you know, very limited purposes, and kind of shoehorn under that exception. And then at the same time, say, you know, it's okay to go under that. We don't need to go through the rule processing process, even though then you do go through... You're going through it right now. And my second question is, what's the status of that? So I just... I'm having a little trouble with this whole scenario as it's playing out. And so why? So the... I mean, as you mentioned, the rule is fairly narrow. It's a federal agency making the application here for a congressionally mandated and highly regulated by statute fishery. That fishery has taken measures to reduce bird take already. And this is... It is really something that doesn't happen often that a federal agency will seek one of these permits. The Fish and Wildlife Service has a regulation that it interpreted as requiring it to process the permit, not simply to turn it away. If the regulation... It's the Fish and Wildlife Service's policy. I forget the citation. I think it's in the response to comments. The Fish and Wildlife Service's policy is to process the permit applications as it receives them. It certainly could now, I suppose, return applications if it didn't have that policy and say, this isn't required at all. But that's not what it did. Yeah. Instead, it went through this exception, which it seems like it completely changed its position. The Fish and Wildlife Service gave no explanation for why it changed its interpretation of this So, doesn't that alone cause some sort of question on whether the decision is arbitrary and capricious? I don't think there was a policy of never granting... Well, for the Navy, if you asked the Navy, they probably would say there was a policy. Let me address that case. If you look to the district court decision in that case, it describes the rejection of the permit to the Navy. One of the reasons given, as recited in the... They're reciting what the Fish and Wildlife Service said in that case. They said that there was no way for the Navy to monitor the take. It was dropping bombs or whatever, live fire, and it couldn't keep track of how many birds it had taken. By contrast here, you have a fishery that has 100% observer coverage on its vessels. They do that for the purposes of maintaining the limits on turtle take, which are hard limits in their regulations. The observers on every vessel and every trip that goes out for the long line shallow set fishery, they have observers who monitor the bycatch, not just of turtles and fish, but also of birds. There is a way to monitor the incidental take of birds here that was not present in that Navy example. They don't really explain that. All of a sudden, a change in pursuing an exception under this exception. We cited in our brief a handbook from 1996 that the Fish and Wildlife Service issued that was a handbook on habitat conservation planning. They said in that handbook, and that was in the context of granting incidental take authorization also, so there would be typically a bird that was listed under the ESA as well as under the Migratory Bird Treaty Act. They say in that handbook that they can interpret related to as meaning including incidental bird take because the activity incidentally takes migratory birds. This notion that this is a change in interpretation, I don't think is entirely accurate. You would agree that this particular permit, leaving aside the foreign vessel issue, is not intended to benefit the birds? The permit does include some benefits to the birds. The activity does not benefit the birds. That's true. As to their argument that that has to be something that the special purpose permit covers, I perceived other compelling purpose in the regulation. Except for you concede that Fish and Wildlife Service failed to explain the compelling justification for the special use permit. Shouldn't we just remand it so the agency can provide this requisite explanation for the unprecedented permitting action? That's an option. Our position is not that we didn't concede that they failed to provide the explanation. Where is the explanation? You're saying that report that you read from, that's the explanation? No, that was 1996 guidance. Where's the explanation? There's not an explanation of a change in policy because they didn't view it as a change in policy. What they said in the individual documents, the environmental assessment and whatnot, they said this is a case by case determination. We're not creating broad standards for future action. Agencies have leeway to do that. They can decide whether to pursue rulemaking or adjudication. Even in adjudication, they can flesh out an interpretation of the standards they're applying without it applying to each and every case going forward in the future. I wanted to ask a question about the turtles of you, but before I do that, you may have answered this, but what's the status of this regulation going on right now? We're told that they intend to issue some sort of proposal, which they would publish notice of in the Federal Register before the end of the year. I don't know the exact date. All that they put out was a notice of what's called scoping, so it's not even a proposed rule yet, but I'm told that they are in the process of trying to publish a proposal. Whether it's a rule or some other guidance, I don't know, but we'll certainly make the court aware of it when that's published. Other than economics, what is the compelling justification? Economics is a part of it, but it's more that Congress has mandated fishing in the exclusive economic zone and set up a very comprehensive statutory scheme and directed the Secretary of Commerce to, through this system of preparing fishery management plans to develop fishery management plans that optimize the yield of fish. And so it's a congressionally mandated program that if it were criminally liable or otherwise prohibited from incidentally taking birth, it just couldn't operate. And your justification would be regardless of the take, then? Your answer implies that it doesn't make any difference what the take is. Well, there's no proven way to eliminate take altogether. Right. I mean, your answer implies that there's no threshold level which couldn't prohibit the activity because Congress had mandated. Is that what you meant to say? You couldn't close the fishery. Well, I mean, the fishery has been closed entirely for periods of time. It's not clear from the record that there is a solution to eliminating all bycatch here. So by the record here, the fishery presumably would be closed. Well, I thought your argument was that the compelling justification was contained in the documents, even though it wasn't specifically made, and that the compelling justification that you were arguing is that a fishery is economically important and will have an insignificant impact on migratory birds. Yeah, that's a big part of it. Okay. Since it's not specifically made, what is your argument that the compelling justification is satisfied? It's all of the things you just mentioned as well as the fact that the fishery is congressionally authorized and enabled. So economics, congressional mandate, what else? Also the very low take of birds, and it has no – That's not a compelling justification. That's a justification that's not compelled. Well, how does the international situation come in? So that – it's been hypothesized, and in the turtle context, it's more clear that there's data that shows that if U.S. flag vessels are not fishing there, foreign flag vessels would be, and would be incidentally taking turtles. If you say that this fishery – if this fishing can't go on, someone will fish. Yes. That will not – and we have no ability to monitor those people. You don't have the ability to monitor it or direct them to reduce take. So here there's a fishery that's voluntarily undertaking measures to reduce take, not just of birds as well as other species like turtles that are by catch. So in your view, do international vessels have the right to go into these waters now? It's the high seas, so they can go there anyway. Unless there's many fish at U.S. ports or U.S. flag vessels. That's right. They could go there anyway. It's just a matter of – And what does the data show on the essence of foreign vessels coming in now? Is there any data in the record? Not that I'm aware of. I see I'm – No, don't worry. We'll give you time. I had a question about the turtles, if I could ask it. Because I'd like for you to respond to the question I asked your opposing counsel. And I'm focusing on the climate-based model prediction that the loggerhead sea turtle would become extinct within 25 years. It seems like the – well, the National Marine Fisheries found no jeopardy. And looking at the biop, it seems to support its decision by saying that the harm to the turtles will probably be less severe than the model predicted. But I'm curious, can you point to the evidence that supports that conclusion? A couple things to unpack from your question. One is that the prediction is not that they will go extinct within 25 years. It's that the population would be reduced by 50 percent. And so there's a difference. At the outset of the action – Well, there was a reference. The phrase – the jargon that – the unfortunate jargon that the agency used was quasi-extinction threshold, which they just picked as a level below which to mark reductions. And they said this is the level under which 50 percent of the population will be reduced. When will we get to this threshold? But that's what they used. And you're now explaining it, but they didn't explain it that. They did. With respect, that explanation is in the record. I mean, it's a fairly technical explanation, but it's not the equivalent of extinction of the species. No, but I think if you hit the quasi-extinction threshold, then probably you're getting into the area where it might not be recovered. They aren't going to be extinct, but it's going to be hard to reverse in layman's terms. So I'm not sure about recovery. I think that recovery depends in part on the numbers, the population numbers, the absolute numbers. And what the agency saw from the classical model and from nesting data, not just the models, but the nesting data at the time indicated that turtle nests for loggerheads were very high. They were increasing. And so trying to explain that with a normal population model, it would indicate that populations would continue to increase. Turtle nesting numbers were very high at the time. What the other model showed, the climate-based one, was that the hypothesis is that data of fluctuating populations over time can be explained by the periodic warming of the ocean under this decadal oscillation. And so they said, okay, but we can't predict oscillations in the ocean temperatures beyond about 25 years. But let's see what happens up to 25 years under this other explanation. And they said, okay, even though the nesting is going up now under the classical model, they'd say, well, it keeps going up, turtles keep improving. The other model said, well, you get the ocean current changing, ocean temperatures changing, and you have another period of downward trend. But that would presumably come back up. So even if it's going downward, I think the number referenced was 4 to 11 percent. You're starting with what's already very high nesting numbers. Just to briefly explain that 4 to 11 percent. Go ahead. Okay, and then I'll conclude. That 4 to 11 percent does encompass a lot of conservative assumptions about, for example, the annual estimated take of the – or the annual estimated contribution of the action to loggerhead deaths was 0.3 turtles, and they rounded it up to 1. Right. That's factored in. And there are other conservative factors as well. Right. I mean, I think that's the number that jumps out. If you're talking – getting below a quasi-extinct threshold, and you're taking as much as 11 percent of the turtles total, I mean, that's a fairly startling statistic when viewed – just taken out of the report. In context, maybe not, but it's – 11 percent's pretty high. I mean, that's getting to the levels we were looking at in the salmon case. So the overall percentage of the population that would be attributed – that would be lost attributable to this action over that 25-year period, though, was determined to be 0.35 percent of the current population. That's elsewhere in the record, but it's in there. Right. So that – looking at both models and looking at the baseline and all the data together, the service didn't attribute too much significance to the absolute numbers or the precise numbers from the models. It took it all into consideration. But didn't that – a large part of that difference has to do with the spillover effect, correct? The 4 to 7 percent range? No, no, the – saying – as opposed to saying 4 to 11 percent versus the eventual number, which is not particularly significant. I have to go back and look at it to see if that's the case. I mean, they determined that either way, with or without the spillover effect, that they still believed their population was large enough at that point in time, as I said, the high nesting numbers, that those reductions would not result in the species being unable to recover, unable to breed and whatnot, and it needs to function to recover its population. Okay. Further questions? Okay. Thank you, counsel. And can we put on five minutes? May it please – excuse me. May it please the Court, Ryan Steen here on behalf of Intravener Hawaii Longline Association. I'd just like to start by putting out some context out there, which is why I think Intravener can help inform these cases. I want to ask you a question about the turtles. I understand that longlines are set for significant periods of time. How is it, then, that the turtles that are hooked on the longlines usually survive? Why don't they drown? Because aren't they – don't they have to breathe air? How does that work? They can breathe air. They cannot breathe air for a pretty significant period of time before they actually drown. Also, this is a shallow-set fishery, and so on retrieval, it's retrieved – the line is retrieved much more quickly than, for example, in the deep-set fishery, where it isn't retrieved as quickly. And the data shows that there's never been a turtle landed that was dead. So every single turtle that this shallow-set fishery has caught has been released alive. Well, do they kind of come up and then breathe, or are they just – how long can they go without breathing, or what's the – how does that work? I don't know the precise answers to that, Your Honor. It just seems a little incredible that none of them ever drown if they have to breathe air. Right. Well, they can – again, I know that they – I don't know the specific biology of a loggerhead turtle or a leatherback. Okay. But I know they can go a fairly significant period of time without breathing. I know that oftentimes they are hooked on retrieval, and so when they're hooked on retrieval, they're brought up to the surface. And again, the data shows that every single turtle that has been caught has been released alive, and that's with 100 percent observer coverage on these boats. So it's pretty good – Could there be some that drown that are just down there that you don't recover, or – I suppose if one got off of a hook, that could happen. We're not aware – there's no data that suggests that is happening. Okay. Okay. Give us context. Okay. So, you know, the plaintiffs explained in their view that this is a small fishery that causes enormous harm. And I would just point out that that is contrary to every agency finding that's been made about this fishery since 2014 – or 2004. Just to put it in context, this is from 2015, so I know this data is not – this isn't – this is context. This isn't record information. But the fishery set 1,178 total sets. That was 1.3 million hooks. And out of that 1.3 million hooks, they hooked 55 lace and albatross, six of which were released dead. They hooked 41 black-footed albatross, 10 of which were released dead. They hooked only six leatherback turtles, all released alive. And they hooked only 15 loggerhead turtles, all of which were released alive. And again, this is with 100 percent observer coverage. So for turtles, that means that one is getting hooked one out of every approximately 60,000 hooks, one out of every 56 sets. So it is a rare occurrence that this happens. And the data are approximately similar for seabirds. So the plan is to paint a picture that these boats are out there constantly catching seabirds, constantly catching turtles. But that is just not true. And as the record shows, and as we set out in our briefing, there's been numerous findings by the agency about how protected this fishery is and how it operates so well. This is from the record. The United States is a recognized leader in fisheries management worldwide, and the Hawaii shallow-set longline fishery is among the most strictly regulated and sustainable suppliers of fresh seafood. Currently, the Hawaii longline shallow-set fishery has the most restrictive regulations to minimize sea turtle bycatch of any fishing fleet in the North and Central Pacific with 100 percent observer coverage. So tell me about side setting. That seems to be the preferred alternative if you're going to continue. And there's an implication in the documents from the government that that's too expensive. But I didn't see any numbers, and I expect you can help me with that. So for side setting, Your Honor, most of the studies that have been done on side setting involve the deep-set fishery, not the shallow-set fishery. There is some discussion in the documents at SER 317 about a case study that NINSS did on side setting and really got some inconclusive results, at least according to that document. What's the reference on that? SER 317. Thank you. It wasn't clear if that was specific to shallow-set or deep-set, but I think it involved both types of fishermen. So to summarize this point, you doubt the viability or the benefit of side setting? Well, I think what that study found is that some people had success with it and some didn't have success because it was not economically viable, there was operational trouble with it, and then there's a safety concern because typically shallow-set fishery sets the weight near the middle of the branch line, whereas doing side setting requires you to set the weight closer to the hook, and so some fishermen expressed a safety concern with that. Now cost. The government indicated that that would have some economic impact, and I didn't see any data on that, so tell me. I don't know the precise cost of what it costs to transfer. I mean, there is a cost that's involved in having to transfer your boat over to be able to retrieve the gear from the back, but I don't know what the precise cost is. Okay. Thank you. There were some questions about the ESA and this climate-based model that I'd like to address, if that would be fine with the court. First of all, I'd like to point out that the government did not make a finding that this fishery would result cause a 4% to 11% decline in loggerhead turtles. It reported in its biop, which is laid out with a lot of clarity at numerous points, that it ran the model, that all models aren't perfect. In fact, no model is accurate, but they are a model. And they ran this new model, and it produced these results. And they identified some caveats, which are at SCR 143. One caveat was that it has been recently developed and is subject to additional development and refinement. It was not based on the input of a lot of scientists and needed additional input. It was predicted for only 25 years. Another very important point that the district court recognized, that is at ER 44, was that the model was run, and it didn't account for the mortality of hatchlings from adult females that would be taken by the fishery. And the reason why that is really important is that the data shows, and this is at SCR 496, 523, and 531, that one out of every hatchling turtle survives. And so when this model, when you run the model, and they assume the fishery takes an adult female turtle, and we're going to assume it removes that turtle for the fishery, and we're going to assume that 100%, which is what the model assumed, of all the hatchlings that that turtle would have are being removed because of the fishery. That was all built into this model, and so it was creating not a very accurate representation of what the fishery would be responsible for taking. And so the agency recognized that that was another limitation of this model, and that is something the district court recognized. Right, I mean, the model couldn't account for everything. It didn't deal at all with male turtles, right? The model? Yeah. The model was based on, because of the lack of data,   and that is something the district court recognized. If it would have included males, it would have, on the flip side, also had a whole bunch of information about how many males there are. The reason it looked at adult females is because the only abundance information they have are adult females, so it was having to compare against that. The other thing the model assumed, which was that the fishery was going to be fishering at 5,500 sets a year immediately, and the agency didn't expect the fishery to go to 5,500 sets a year immediately, expected it to gradually ramp up to that, and still currently the fishery is fishing at 1,200 to 1,300 sets a year. And so it was because of all these factors that the agency concluded, and this is at SCR 143 and throughout that section of the BIOP, that the analysis is primarily based on a qualitative evaluation of the general direction and magnitude of the probabilities that are projected rather than by a strict application. And again, it had competing models for loggerheads.  Right, but that was rejected by the agency, and I think for good reason. I mean, the other model was more sophisticated. It was more sophisticated, but it was that information. So what the plaintiffs are arguing with here is how the agency used the model and the agency's rationale, which is very well explained in the BIOP, for why it wasn't attributing a finding based on that model that the fishery is causing 4 to 11 percent. In fact, they found that the fishery is not causing that. Well, they started off with the fact that it probably would cause, again, the models predicting we're going 25 years out, 4 to 11 percent, and then it took those figures down. But I think any time – I mean, the concern is any time the model as a whole predicts 50 percent decline in a population and into the quasi-extinct threshold, whatever that truly means, I mean, that's a matter of concern if, in fact, you're going to get to the 4 to 11 percent margin. I mean, with the loggerheads, that's the primary concern, I think. Well, again, with the quasi-extinct threshold, the agency was also very clear that it was just a number it was setting to measure this by. It said that even below that threshold, loggerheads could be recoverable. So it wasn't saying below that they were going to be unrecoverable. And, in fact, the agency took – I guess the point is here is the agency took all of this information. There's a lot of information. It took all the information into account and said, based upon the whole of all of this, the two competing models, all the caveats and assumptions that we built into this, and all of the other information we have, we find that this fishery is not having a detectable influence on the population. It's not imperiling the recovery, or it's not causing jeopardy to the recovery or the survival of the species. And so it's really the way the agency used the science and the assumptions it made in using the science that the plaintiffs disagree with. And that's where this court has to defer to the agency's expertise and the agency's well-explained decision that this is where it was concluding. You're about five minutes over your time. But it's an important case, and I want to make sure you're heard. Are there any further questions? Go ahead. Sure. And I'll try to distill down to where you guys left it off at so I don't recite everything that was already explained with Mr. Hankin. I do think that the fishery is deferring to the government on defense of the permit. The fishery didn't necessarily ask for the permit here. It's supportive of it because this fishery has been supportive of many things the government's asked it to do to have the right impact on the environment. I will say, though, however, that Protect Our Communities, I think, does control here. And that case says very clearly that when you have the Administrative Procedure Act does not target regulatory action by the BLM that permits a third-party grantee to engage in otherwise lawful behavior and only incidentally leads to subsequently unlawful action. The difference here, or the reason the case is found that way and the reason it applies here, is it has to be the government that's doing the act. The MBTA speaks about to kill or to harm. The government has to be doing the act. The BLM wasn't doing the act there. Here the NIMS is not doing the act. It is not acting. The CITCO case that we notified through a supplemental authority talks about this is in the September 15, 2015 Supplemental Authority, talks about how the MBTA dispels with the mental component by having it be a strict liability crime, but it doesn't dispel with the requirement that there be actus reus, that the actor do the act. And so the BLM, like NIMS here, isn't doing the act of taking turtles. So that's why the court relied on that holding, and that's why this court should follow it. Mr. Hankin referred to trying to distinguish this case, relying on the court's kind of speculative statement in there about how maybe the National Marine Fisheries Service could be acting in more managerial capacity. But what I would submit, Your Honors, is that agencies like National Marine Fisheries Service, BLM, Bureau of Ocean Energy Management, U.S. Forest Service, they all manage public resources, and they authorize uses of those public resources subject to conditions, and they all place conditions on it, some more onerous than others. But the principle of that case shouldn't distinguish among what type of agency managed what kind of a resource. The fact is that the agency is acting in a regulatory capacity, and I think it's a pretty fuzzy line or dangerous area for this court to go into if it's going to start distinguishing between which agencies are, quote, managerial and which ones are acting in a regulatory capacity. And my time's up, so I'll go ahead and stop there. Thank you for your argument. We'll hear rebuttal. Put on five minutes, please. Thank you. May it please the Court, since Mr. Steen talked about sort of the big context, I'm going to briefly address that. He was citing from Shalo's annual status report for 2015, which is available on the Fisheries Service website, and he points out that, hey, we only caught 15 loggerheads. Yeah, but you only caught 15 loggerheads fishing at about one-fifth the level that the National Marine Fisheries Service authorized you to fish. They said you can fish without limit. We assume 5,500 sets. They're only putting less than 1,200 sets out there. Nonetheless, they're catching 15 loggerhead turtles. If you scale that out, you'd be looking at over 60, and they'd be going well beyond the authorized level of take. So this fishery does, for its very small size and the few sets it puts in the water, it causes a lot of damage, and that's what our concern is, Your Honor. Now, with respect, and the other thing is, he mentions that all these loggerheads come back alive. Well, the Fisheries Service analysis, they look at that, and they analyze the likelihood that released turtles are going to die. Otherwise, they would have found that there'd be no fatal take in the fishery. But they do find that there are going to be deaths, both the loggerheads and leatherbacks, in the fishery. With respect, overall, to the ESA issue, if this court can discern how the Fisheries Service got from the models that its expert developed, that it chose, the values that those models came up with, its use, not our use, but its use of the quasi-extinction threshold as the main determinant of when you have jeopardy, if you can figure out how, when they wave their hands over that and say, well, it's okay, then you should affirm. But this court is required to insist that the agency articulate how it got from point A to point B, and that's particularly important in the context of the Endangered Species Act. And that's for the loggerheads and for the leatherbacks, when their own expert says, there is a model available in which I have a high degree of confidence. It may not be as good as a climate-based model, but it goes well out into the future, and it says that if you continue taking loggerheads in the fishery, you're going to have an almost 90% decrease in the key population of turtles that the fishery interacts with, and the agency ignores that. That's a failure to give the benefit of the doubt to the species. Turning to the Migratory Bird Treaty Act, even today the Fish and Wildlife Service is denying that they had a policy that they would not issue infill take permits to commercial activities that are not focusing on bird conservation. Notwithstanding their clearly expressed statement in the 2009 Federal Register that I cited when I first got up here, we do not have an infill take permit for the wind industry. We don't have an infill take permit for anyone unless you're doing conservation-related activities. If you look at page 82 in the Exhibits of Record, they've issued two infill take permits for conservation activities. They've also issued a special purpose permit to Native Americans to possess migratory birds for religious purposes. That's a First Amendment purpose, clearly compelling. Just making money, if that were a valid basis, then why wouldn't they tell the wind industry? We have a federal policy to promote renewable energy. That's what the court was talking about in Protect Our Communities Foundation. We have money to be made in clean energy. There's a societal value there. But yet in 2009 they said we don't have infill take for your industry. The court's been grappling with their failure to articulate a compelling justification for why they gave a permit to the fishery. And I would recommend that you look at Supplemental Exhibit of Record, page 351. That's in the Environmental Assessment. And they say one of the factors we need to look at is, quote, the degree to which the fishery will implement all practical methods to avoid the take of migratory birds. Do they do that analysis? Absolutely not. In the draft EA, they do. At page 157 of the Excerpt of Record, they say that they disagreed that current regulations have reduced take in the fishery to the maximum extent practicable. That analysis is completely gone in the final EA. They just ignored it altogether. There is no connecting of point A to point B. With respect to whether or not the fishery service needs a permit, we've already talked about the Piri case where the panel last week affirmed that the Navy was carrying out these activities. So it covered infill take. We talked about the National Marine Fishery Service having this active managerial component that the panel viewed as distinguishable. I would turn your attention to page 11 where they talk about obligations under the Endangered Species Act. I see that my time is up. Go ahead, finish your talk. Okay. The court on page 11 says, in several cases implicating other environmental protection laws, the agencies in question acted unlawfully because they inappropriately exercised their regulatory authority to sanction conduct by third parties that was itself unlawful. And what the panel found as determinative is whether the agency had an affirmative duty to ensure that whoever they were regulating complied with the law. They said BLM did not have that affirmative duty. Under the ESA, agencies do have the affirmative duty, and we'd submit under the Magnuson-Stevens Act where it is the fishery service that approves all the fishery management plans and all the regulations implementing it and cannot, pursuant to 16 U.S.C., I believe 1838, cannot approve those unless they determine that they comply with all applicable law. So like the Endangered Species Act, the fishery service here is in a unique position with respect to the fishery it regulates. It needs to ensure their compliance with all applicable laws, including the MBTA, or else their actions are unlawful and subject to challenge under the APA. So that is why the fishery service needs a permit. That is why our clients are so concerned about this issue. Thank you, counsel. Thank you. The case just heard will be submitted for decision. Thank you all for your arguments today, very helpful. And we will be in recess for the morning. All rise.
judges: Thomas, Callahan, Murguia